UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

FREMICHAEL GHEBREYESUS et al.,

Plaintiff,

v.

FEDERAL DEMOCRATIC REPUBLIC OF ETHIOPIA et al.,

Defendant.

Case No. 2:22-cv-01717-RFB-EJY

**ORDER**

## I.   INTRODUCTION

Before the Court for consideration is Defendant Brook Bekele Beshah's Motion to Dismiss (ECF No. 62), Defendants Federal Democratic Republic of Ethiopia, Ministry of Foreign Affairs of Ethiopia, City of Addis Ababa, Sub-City of Bole, Addis Ababa, and Federal First Instance Court of Ethiopia ("Ethiopian Government Defendants") Motion to Dismiss (ECF No. 63), and the parties' Joint Motion for Leave to Exceed Page Limits for Renewed Motions to Dismiss Briefing (ECF No. 57). For the following reasons, Defendant Beshah's Motion to Dismiss is denied and Ethiopian Government Defendants' motion is granted in part and denied in part. The Court grants the Joint Motion for Leave to Exceed Page Limits *nunc pro tunc*.

## II.   PROCEDURAL BACKGROUND

Plaintiffs filed a complaint against all Defendants on October 28, 2021 in the United States District Court for the District of Columbia. ECF No. 1-1. Plaintiffs' complaint raises four causes of action: takings in violation of international law against the Ethiopian Government Defendants, civil RICO against all defendants, RICO conspiracy against all defendants, and breach of contract against Defendant Beshah. Id.

On December 21, 2021, Defendant Beshah filed a Motion to Dismiss the complaint. ECF No. 15. On April 6, 2022, the Ethiopian Government Defendants filed a Motion to Dismiss the complaint. ECF No. 29. On September 28, 2022, Judge Christopher R. Cooper granted Defendant Beshah's Motion to Dismiss for lack of personal jurisdiction and denied without prejudice the Ethiopian Government Defendants' Motion to Dismiss. On October 12, 2022, the case was transferred from the United States District Court for the District of Nevada.

On December 12, 2022, Magistrate Judge Youchah granted the parties' Discovery Plan and Scheduling Order with discovery due on May 10, 2024. ECF No. 58. On December 30, 2022, Defendant Beshah filed the instant Motion to Dismiss. ECF No. 62. On January 27, 2023, Ethiopian Government Defendants filed the instant Motion to Dismiss. ECF No. 63. On August 4, 2023, Magistrate Judge Youchah granted Defendants' Joint Motion to Stay Discovery pending the resolution of the instant Motions to Dismiss. ECF No. 88. On August 15, 2023, the Court held a motions hearing. The Court ordered that the stay on discovery be continued as to the Ethiopian Government Defendants only. ECF No. 93. The Court allowed Discovery to proceed consistent with the December 12, 2022 Joint Discovery Plan and Scheduling Order against Defendant Beshah, with no depositions permitted at this time. This order follows.

## III.   FACTUAL ALLEGATIONS

### a.  Background

Mr. Fremichael Ghebreyesus individually and in his capacity as Trustee of the Estate of Ghebrelul, deceased; and Mrs. Simret Zerai Yohannes ("Plaintiffs"), filed this complaint. ECF No. 1 at 2. Plaintiffs allege the following facts in their complaint:

Mr. Ghebreyesus is a U.S. citizen residing in Minnesota and is the son of Ghebreyesus Ghebrelul Fremichael ("Ghebrelul"), deceased, and serves as Trustee of the Estate of Ghebrelul. Mrs. Yohannes resides in Asmara, Eritrea. She is the mother of Mr. Ghebreyesus and widow of Ghebrelul. Defendant Brook Bekele Beshah resides in Nevada. The Ministry of Foreign Affairs ("MOFA") is a department of the Ethiopian Government responsible for diplomatic relationships abroad. Addis Ababa is the capital of Ethiopia. Bole is a sub-city of Addis Ababa. The Federal First Instance Court of Ethiopia ("FFIC") is a court within the Ethiopian judiciary that has jurisdiction over disputes not exceeding 5,000 Birr.

Mr. Ghebreyesus's father, Ghebrelul, was an Ethiopian resident of Eritrean ethnicity who, together with his wife, Mrs. Yohannes and son, Mr. Ghebreyesus, built a civil engineering business in Ethiopia called Biselex Ethiopia PLC ("Biselex"). Biselex focuses on buying, selling, importing, and exporting water and power equipment. Throughout the 1980s and early 1990s, Ghebrelul—together with his wife, Mrs. Yohannes, and his son, Mr. Ghebreyesus, who worked for the company–grew Biselex into a very profitable enterprise. By the early 1990s, Biselex operated not only from its central location in Addis Ababa, but also had affiliates located in Eritrea, Kenya, and Jersey, United Kingdom. Ghebrelul and his wife Yohannes respectively owned a 66.67% and 33.33% in Biselex. Ghebrelul also owned a house in the Bole Sub-City of Addis Ababa in Ethiopia.

The United Nations recognized Eritrea's independence in 1993. Thereafter, Ghebrelul and his family were regarded as being Eritrean in nationality and treated as such by the Ethiopian government. In May 1998, a long-standing border dispute between Eritrea and Ethiopia erupted into armed conflict. Approximately one month later, Ethiopia accused a vast number of Eritreans living in Ethiopia of spying and mobilizing financial and other resources in support of Eritrea. Ethiopia began a systematic campaign of persecuting Ethiopian residents of Eritrean nationality. As a result, Ghebrelul and his family were forced into exile outside of Ethiopia.

**b.  The Indemnity Contract**

Defendant Beshah, an Ethiopian American executive of Biselex induced Ghebrelul and Yohannes to transfer their shares in Biselex to him to hold in trust and care until circumstances

allowed them to return to Ethiopia. Ghebrelul and Yohannes also entrusted Beshah with the maintenance of their home while they remained abroad in exile. Beshah was required by the terms of an Indemnity Contract entered into in 1999, to return ownership of Biselex and the Biselex Assets back to Ghebrelul and Yohannes once circumstances allowed. The Indemnity Contract also required Beshah to transfer the annual net earnings of Biselex to Ghebrelul and Yohannes. Article 03 of the Indemnity Contract listed the assets of Biselex and their value. At the time of the contract's execution, the value of the Biselex Assets equaled $45,300,600 Birr, or $6,420,997.65 U.S. dollars—now $10,597,736.86 U.S. dollars when adjusted for inflation.

When circumstances allowed for Ghebrelul's return to Ethiopia in 2012, in accordance with the terms of the Indemnity Contract, Ghebrelul demanded Beshah return control and ownership of Biselex and the home. Beshah refused to comply, which forced Ghebrelul to apply to the then newly-formed Committee of Eritrean's Property Reallocation ("CEPR") to confirm his rights in the Biselex Assets and the home. The CEPR recognized Ghebrelul's ownership interests in Biselex and the home and Ghebrelul and Yohannes were able to regain possession of both between February 2013 and August 2013.

### c.   FFIC, FHC, Supreme Court, Cassation Division, and MOFA Actions

Beshah was discontent with the CEPR's determinations and began an enterprise with the Ethiopian Government Defendants to deprive Ghebrelul, Yohannes, and their son Ghebreyesus their rights in Biselex and the home. The FFIC seized control over Biselex Assets in November 2013 after Beshah filed a lawsuit in that forum. But the FFIC did not have jurisdiction over the dispute because it exceeded 5,000 Birr (the equivalent of approximately $265.00 in U.S. in 2013). The FFIC denied Yohannes and Ghebrelul's attempts to intervene in the lawsuit and gave no rationale for its denial or provide any process before denying intervention. The FFIC determined that the CEPR had acted beyond its authority and committed a trespass against Beshah. The FFIC then transferred ownership of Biselex back to Beshah.

Ghebrelul and Yohannes brought an action before the Federal High Court (FHC) of Ethiopia against Beshah, seeking to enforce the Indemnity Contract and restore their ownership of Biselex. On or around November 1, 2018, after five years of litigation, the FHC issued a

decision that recognized the validity of the Indemnity Contract but refused to recognize and restore Plaintiffs' ownership interests in the Biselex Assets. The FHC prevented Plaintiffs and their counsel from presenting evidence necessary to make their case, including by refusing to permit a key witness to testify on Plaintiffs' behalf. The FHC's decision unreasonably ignored the plain terms of the Indemnity Contract, which required Beshah under Article 4.6 "to restitute the ownership of BISELEX ETHIOPIA PLC17 to the rightful owners whenever circumstances allow." The FHC's decision was also in direct contravention of the CEPR's prior determination that Ghebrelul possessed an ownership interest in Biselex.

At this time, Beshah attempted to steal the home away from Ghebrelul, first by trying to unlawfully modify the FFIC order to cover the House, then by bringing a lawsuit against Ghebrelul in the FHC contesting his ownership of the property. When those efforts failed to come to fruition as quickly as he wanted, Beshah began looking beyond the Ethiopian judiciary to deprive Ghebrelul and Plaintiffs of their property interests in Ethiopia.

In or around February 2019, the MOFA issued Document No. 3-1/129/191/11("MOFA Document") declaring the prior determinations of the CEPR, which recognized Ghebrelul's ownership interests in the House and Biselex, "invalid." The MOFA did not provide any legitimate rationale for rescinding the prior CEPR determinations recognizing Ghebrelul's ownership interests in their home and Biselex. Instead, it referred to unspecified, "multiple laws and decrees" that the prior CEPR determinations allegedly "contradict[ed]."

The MOFA also did not provide Ghebrelul or Plaintiffs any opportunity to be heard prior to issuing its decision. The MOFA Document stated that it was made in response to a January 2019 application submitted by Beshah, but neither Ghebrelul nor Plaintiffs were ever provided any opportunity to review this application or to respond to it. Shortly after the issuance of the MOFA Document, on or around March 27-28, 2019, armed forces arrived to take possession of Ghebrelul's home and forcibly removed the private security guards Ghebrelul had hired to guard his house while he was away.

In or around September 2020, the Federal Supreme Court issued its ruling on the appeal of the Biselex action. The court affirmed the FFIC's decision but did not address any of the clear

legal and factual errors committed by the FHC and identified by Plaintiffs and their counsel. Plaintiffs appealed the Federal Supreme Court's decision to the Cassation Division of that court. However, the Cassation Division also arbitrarily and irrationally affirmed the FHC decision—again, without addressing any of the clear legal and factual errors committed by the FHC and identified by Plaintiffs and their counsel.

Following a serious injury resulting from an attack in 2018, which Ghebrelul believed to be carried out by agents-for-hire retained by Beshah, Ghebrelul transferred all his interests in Biselex Assets to his son, Mr. Ghebreyesus, who in 2001 had become a United States citizen. Ghebrelul transferred his interests via a Letter of Wishes dated October 18, 2018. With Ghebrelul's passing on February 3, 2020, Mr. Ghebreyesus came to inherit Ghebrelul's remaining property interests in Ethiopia, including, but not limited to, his interest in Ghebrelul's home, as well as any and all rights Ghebrelul had under the Indemnity Contract which Mr. Ghebreyesus may not have previously received by virtue of the Letter of Wishes.

a.   **Agreements between Beshah and Ethiopian Government Officials**

Around the same time as the FFIC decision in November 2013, Beshah made an agreement with one or more officials at the FFIC: Beshah agreed to bribe such officials and pay such officials with kickbacks taken from the revenues of Biselex to act in their official capacities to prevent Ghebrelul and Yohannes from having any opportunity to defend their ownership interests in the Biselex Assets.

Beginning in or around 2019, Beshah (from his location in the United States) negotiated and entered into one or more agreements with officials at the Ethiopian Government, the MOFA, the City of Addis Ababa, and the Sub-City of Bole. These officials acted in their official capacities to take Ghebrelul and Plaintiffs' interests in their home and Biselex Assets, as well as Plaintiffs' rights under the Indemnity Contract. In exchange, Beshah agreed to provide valuable consideration to these officials in the form of bribes and kickbacks to be paid from bank accounts he maintains in the United States as a U.S. resident.

The activities included, and continue to include, repeated violations of the Travel Act, 18 U.S.C. § 1952, through the use of facilities of interstate or foreign commerce with the intent to

violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"). Defendants used email and other forms of telecommunications to facilitate their schemes of depriving Ghebrelul and Plaintiffs of their property rights, and Beshah caused money to be wired to the Ethiopian Defendants to further the payment of monetary bribes and kickbacks to foreign officials in Ethiopia charged with carrying out the duties of the Ethiopian Government, the MOFA, Addis Ababa, Bole, and the FFIC as consideration for their takings of the home, Biselex Assets, and Ghebrelul and Plaintiffs' rights under the Indemnity Contract.

Defendants were and are associated-in-fact with an enterprise engaged in activities which affect, interstate and foreign commerce. Defendants unlawfully, willfully and knowingly participate in and conduct, directly and indirectly, the enterprise's affairs through a pattern of racketeering activity.

### b. Presence of Property and Commercial Activity in U.S.

Given Beshah's residency and location within the United States, portions of the Biselex Assets are present in the United States, including, but not limited to, net earnings of the company, which have been deposited in Beshah's U.S. bank accounts, but which belong to Plaintiffs under Article 4.5 of the Indemnity Contract. The stocks of Biselex, which belong to Plaintiffs under Article 4.6 of the Indemnity Contract, are also present at Beshah's location in the United States. The funds Beshah has used and continues to use to pay Ethiopian officials, who acted in their official capacities on behalf of the Ethiopian Defendants to deprive Ghebrelul and/or Plaintiffs of their property rights are located in bank accounts Beshah has maintained and continues to maintain in the United States and in wire transfers originating from the United States that Beshah has made and continues to make to these officials to carry out these schemes.

Biselex has supplied and continues to supply its products to a number of different entities that are within or owned by the Ethiopian Government, including Ethiopian Airports Enterprise; Ethiopian Electric Power Corporation; the Ethiopian Ministry of National Defense. These Biselex products were assets of the company which belonged to Plaintiffs by virtue of the Indemnity Contract. After the Biselex products were transferred to these entities, at least some of them were sold, liquidated, or otherwise converted into cash. At least some of these proceeds were then

commingled with general government revenues of Ethiopia that are present in the United States by virtue of their use to finance various commercial activities carried on by the Ethiopian Government in the United States. Id. at 26.

Some of these proceeds have been used to carry out a number of commercial activities by the Ethiopian Government in the United States, including the promotion of investment in Ethiopian businesses and tourism at the Ethiopian Embassy and Ethiopian Consulate General offices; the solicitation of American tourists through Ethiopian Airlines; the use of U.S. capital and debt markets for investment and to solicit and obtain financing through issuance of Ethiopian sovereign dollar-bonds; and the acceptance of federal grants, aid and loans from the United States.

One of Biselex's major clients is the United States Agency for International Development ("USAID"). Biselex has and continues to sell its products to USAID directly and pursuant to "host country" contracts between Ethiopia (the host government) and Biselex. USAID serves as the financing entity for these contracts. Public funds that have been earmarked and obligated for these direct sales and "host country" contracts involving USAID are present in the United States, including at the U.S. Treasury.

## IV.   LEGAL STANDARD

### a.   Motion to Dismiss

An initial pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." Faulkner v. ADT Sec. Services, Inc., 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted).

To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must do more than assert "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . . ." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, a claim will not be dismissed if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,"

meaning that the court can reasonably infer "that the defendant is liable for the misconduct alleged." Id. at 678 (internal quotation and citation omitted). The Ninth Circuit, in elaborating on the pleading standard described in Twombly and Iqbal, has held that for a complaint to survive dismissal, the plaintiff must allege non-conclusory facts that, together with reasonable inferences from those facts, are "plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).

### V.   Defendant Beshah's Motion to Dismiss

Defendant Beshah moves for this Court to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6), forum non conveniens, *res judicata*, and principles of comity. The Court first considers Defendant Beshah's Motion to Dismiss. For the reasons stated, the Court denies the motion.

#### a.   Federal Racketeering and Conspiracy Act

Section 1964 of the federal RICO Act provides a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962" of the Act. 18 U.S.C. § 1964(c). Section 1962 prohibits "pattern[s] of racketeering activity" conducted by, or for the benefit of, an "enterprise," as well as any conspiracy to do so. 18 U.S.C. § 1962. In order to establish a civil RICO claim, a plaintiff must allege the following: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Constr. Trades Dept., AFL-CIO, 770 F.3d 834, 837 (9th Cir. 2014) (internal quotation marks omitted). "The plaintiff must, of course, allege each of these elements to state a claim." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). "RICO shall be liberally construed in order to effectuate its remedial purposes." § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961.

#### i.   RICO's Extraterritorial Reach

At the outset, Defendant Beshah argues that Plaintiffs do not have a private right of action under civil RICO because they do not allege a domestic injury. Beshah argues that Plaintiffs' injuries occurred entirely outside the United States, in Ethiopia. Beshah also argues that Counts II

and III should be dismissed because Plaintiffs fail to overcome the presumption that the substantive provisions of RICO do not apply extraterritorially. Plaintiffs argue that Beshah ignores that the injuries alleged include deprivations of Plaintiffs' property rights in all of the Biselex Assets, which is more than the "loss of [an] "Ethiopian company." They point to allegations in the complaint which state that the net earnings have been deposited in Beshah's U.S. bank accounts, that Beshah deprived Mr. Ghebreyesus, the rightful owner of Biselex under the Indemnity Contract and the Letter of Wishes executed by his father of his ownership interests, and Mr. Ghebreyesus is and was at all relevant times present in the United States. Plaintiffs also argue that the United States was the center of Beshah's unlawful conduct where he facilitated payments to Ethiopian officials and used email and other forms of telecommunications to further the bribery scheme.

RICO's private right of action does not apply extraterritorially. RJR Nabisco, Inc. v. European Community, 579 U.S. 325, 346 (2016). Therefore, at the pleading stage, a private civil plaintiff must allege "a domestic injury to business or property." Id. (explaining the different extraterritorial reach for civil and criminal RICO claims). In assessing whether there is a domestic injury, the court must "engage in a case-specific analysis that looks to the circumstances surrounding the injury. If those circumstances sufficiently ground the injury in the United States, such that it is clear the injury arose domestically, then the plaintiff has alleged a domestic injury." Yegiazaryan v. Smagin, 599 U.S. 533, 545 (2023). "Because of the contextual nature of the inquiry, no set of factors can capture the relevant considerations for all cases. RICO covers a wide range of predicate acts and is notoriously 'expansive' in scope." Id. ("what is relevant in one case to assessing where the injury arose may not be pertinent in another."). In Yegiazaryan, the Supreme Court considered "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." Id at 544.

The Supreme Court found a domestic injury had been alleged in Yegiazaryan because "[m]uch of the alleged racketeering activity that caused the injury occurred in the United States." Id. at 545. Although some of the illegal activity took place abroad, "even those 'wrongful acts and plans were devised, initiated, and carried out . . . through acts and communications initiated in and directed towards Los Angeles County, California,' with the 'central purpose of frustrating

enforcement of [the] California judgment.'" Id. at 545-46. Additionally, "the injurious effects of the racketeering activity largely manifested in California." Id. at 546. As the court below, the Ninth Circuit, noted: "Us[ing] bank accounts located within the United States to facilitate or conceal the theft of property located outside of the United States, on its own, does not establish that a civil RICO plaintiff has suffered a domestic injury." Smagin v. Yegiazaryan, 37 F.4th 562, 569 (9th Cir. 2022). "But when a plaintiff alleges that a defendant misappropriated 'tangible property located in the United States . . . even if the owner of the property resides abroad,' the plaintiff has alleged a domestic injury." Id. In a very recent Ninth Circuit opinion, the court held that the plaintiff had alleged a domestic injury because it owned its injured property was in the United States even though the property at issue was ultimately shipped to China. Global Master International Group, inc. et al v. Esmond Natural, Inc., No. 21-55809, 2023 WL 5159580 (9th Cir. Aug. 11, 2023).

Under the Letter of Wishes executed by his father, Plaintiff Ghebreyesus became the rightful partial owner of Biselex and came to inherit Ghebrelul's remaining property interests in Ethiopia, including his interest in the home, as well as any and all rights Ghebrelul had under the Indemnity Contract which Mr. Ghebreyesus may not have previously received by virtue of the Letter of Wishes. This entitles Plaintiff Ghebreyesus not only to the firm itself and the home (both of which are based in Ethiopia) but also to the firm's assets and net earnings, which has been and is currently located in the U.S. in Defendant Beshah's bank accounts. Plaintiff Ghebreyesus alleges that he is and was at all relevant times present in the United States, meaning that he owned the injured property in the U.S. and was deprived of these earnings while residing the U.S. Thus, Defendant Beshah misappropriated tangible property located in the United States and much of the injurious effect of the unlawful acts occurred in the U.S.

Importantly, just as much of the "wrongful acts and plans were devised, initiated, and carried out . . . through acts and communications initiated in [the U.S.]" in Yegiazaryan, Plaintiffs similarly allege that Defendant Beshah—an Ethiopian-American residing in Nevada—carried out much of the alleged racketeering here in Nevada. According to Plaintiffs, Defendant Beshah paid and continues to pay alleged bribes and/or kickbacks to Ethiopian officials to deprive Plaintiffs of their property rights from bank accounts Defendant Beshah maintains in the United States.

Defendant Beshah also used email and other forms of telecommunications from his location in the United States to communicate with Ethiopian officials in furtherance of his schemes. Plaintiffs also allege that part of the initial agreement between Defendant Beshah and the Ethiopian government was negotiated in the United States.

Therefore, the Court finds, at this procedural stage, that Plaintiffs have asserted enough facts specific to Defendant Beshah's actions in the U.S. to allege a domestic injury. For the reasons discussed above, the Court also finds that Plaintiff Ghebreyesus has alleged standing[1] by demonstrating that he has "been injured in his business or property by the conduct constituting the violation." Sedima, 473 U.S. at 496-97.

Unlike RICO's private right of action, the substantive provisions of RICO do apply "extraterritorially to [foreign conduct] the same extent that RICO's predicates do." Yegiazaryan, 599 U.S. at 542 (citing RJR Nabisco, 579 U.S. at 339 ("§ 1962 applies to foreign racketeering activity—but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially . . .  a pattern of racketeering activity may include or consist of offenses committed abroad in violation of a predicate statute for which the presumption against extraterritoriality has been overcome.")).

Plaintiffs allege Defendant Beshah committed "racketeering activity" by violating the Travel Act, 18 U.S.C. § 1952, through the use of facilities of interstate or foreign commerce with the intent to facilitate violations of the anti-bribery provisions of the Foreign Corrupt Practices Act (FCPA). Plaintiffs allege most if not all of Beshah's relevant conduct occurred and continues to occur domestically in Nevada where Beshah resides. Importantly, the presumption against extraterritoriality does not apply to conduct that occurred in Nevada. To the extent that any of Defendant's conduct occurred abroad, Plaintiffs allege violations of the Travel Act through violations of the FCPA. The FCPA, which prohibits domestic concerns from "corruptly do[ing] any act outside the United States," § 78dd-2(i)(1) "plainly appl[ies] to at least some foreign conduct" and therefore has an extraterritorial application. See RJR Nabisco, 579 U.S. at 338-39

---

[1] Defendants concede that Plaintiff Yohannes as a prior shareholder of Biselex has standing. The Court agrees.

(noting that three of RICO's predicate acts applied extraterritorially through their use of the language "outside the United States"); Clayco Petroleum Corp. v. Occidental Petroleum Corp., 712 F.2d 404, 409 (9th Cir. 1983) (explaining that in enacting the FCPA Congress considered "bribery abroad" to be a "severe" foreign policy problem) (emphasis added); Evan Forbes, Extraterritorial Enforcement of the Foreign Corrupt Practices Act: Asserting U.S. Interest or Foreign Intrusion?, 93 S. Cal. L. Rev. Postscript 109 (2020) (noting that the FCPA applies extraterritorially). In sum, the presumption against territoriality does not apply to any of the alleged domestic conduct and Plaintiffs have overcome the presumption to the extent that they allege conduct occurred abroad because the FCPA applies to foreign conduct.

## ii.   Pattern of Racketeering Activity

Defendant Beshah argues Plaintiffs fail to allege the "racketeering activity" element because they do not make out violations of the RICO predicate offenses of the Travel Act, and the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2 and 15 U.S.C. §78dd-3. According to Beshah, Plaintiffs fail to allege each element of the Travel Act, namely Plaintiffs do not allege a "business nexus" as required by the FCPA's language which provides that the provision of something of value must be done "in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person." § 78dd-2(a)(1)(B). Beshah argues that this was not meant to cover disputes over "a business" or "a property." Rather it was intended to cover bribes that facilitate business such as securing government contracts or favorable tax regulations. Beshah also argues that Plaintiffs' complaint does not allege a "pattern" of racketeering, because it does not identify a continuous set of predicate acts, but rather, a generalized, speculative allegation of bribes and kickbacks.

The Court finds that Plaintiffs have adequately alleged that Defendant Beshah violated the Travel Act 18 U.S.C. § 1952 through underlying violations of the Foreign Corrupt Practices Act 15 U.S.C. § 78dd-2 and that these violations constituted a "pattern of racketeering activity." "Racketeering activity" is any act indictable under several provisions of Title 18 of the United States Code, and includes the predicate act of Travel Act violations through violations of the

Foreign Corrupt Practices Act—both of which are alleged in this case. See 18 U.S.C. § 1961(1) (identifying Travel Act as a predicate act under RICO). A "pattern of racketeering activity" is defined as at least two acts of racketeering activity. 18 U.S.C. § 1961(5). However, "while two acts are required under the act, they are not necessarily sufficient." Turner v. Cook, 362 F.3d 1219, 1229 (9th Cir. 2004). To satisfy the pattern requirement, the plaintiff must allege that the racketeering predicates are related and "that they amount to or pose a threat of continued criminal activity." Id.

Plaintiffs' RICO claim alleges a "pattern of racketeering activity" through violations of the Travel Act, 18 U.S.C. § 1952 and Foreign Corrupt Practices Act (FCPA). The Travel Act prohibits:

> the use of "mail or any facility in interstate or foreign commerce, with intent to distribute the proceeds of any unlawful activity; commit any crime of violence to further any unlawful activity; or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." § 1952(a).

The term "unlawful activity" includes "bribery . . . in violation of the laws of the State in which committed or of the United States" § 1952(b), which encompasses the FCPA. In turn, the FCPA prohibits any "domestic concern," from

> "mak[ing] use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to any foreign official for purposes of influencing any act or decision of the foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the unlawful duty of such official, or (iii) securing any improper advantage . . . in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person."

Defendant Beshah meets the definition of a "domestic concern" because he is a U.S. resident. § 78dd-2(h)(1)(A). Plaintiffs allege that Defendant Beshah used email and other forms of telecommunications to facilitate the scheme of depriving Plaintiffs of their property rights in Biselex and their home. Specifically, Defendant Beshah caused money to be wired from the United States to the Ethiopian Government Defendants in Ethiopia as consideration for their takings of the Biselex assets, the home in Addis Ababa, and violations of Plaintiffs' rights under the

indemnity contract. Defendant Beshah paid a series of bribes and/or kickback to various Ethiopian officials over a period spanning from at least 2013-2019. The bribes were part of a single scheme whose purpose was to deprive Plaintiffs of their property interests in Biselex and their home in Addis Ababa. The scheme itself—the act of paying the bribes and/or kickbacks—amounted to continued criminal activity.

There is no definition of "obtaining or retaining business" or "or directing business" in the FCPA. However, the cases Defendant Beshah cites from the Fifth and Second Circuits both support a broad interpretation of this element. See, e.g., United States v. Kay, 359 F.3d 738, 749 (5th Cir. 2004) ("Congress meant to prohibit a range of payments wider than only those that directly influence the acquisition or retention of government contracts or similar commercial or industrial arrangements."). The Court finds that the bribes Defendant Beshah allegedly paid to Ethiopian officials in order to maintain control over and continue to profit from Biselex meets the definition of "obtaining or retaining business, or directing business to any person" and therefore Plaintiffs plead sufficient facts to state a claim under the FCPA.

### iii. Enterprise

The Court also finds that Plaintiffs' have alleged sufficient facts at this stage to show the existence of an enterprise. To show the existence of an enterprise, plaintiff "must plead that the enterprise has a (A) common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." Eclectic Props. E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 997 (9th Cir. 2014). An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." Boyle v. United States, 556 U.S. 938, 944 (2009) (citing United States v. Turkette, 452 U.S. 576, 580, 583 (1981)).

The crux of Defendant Beshah's claim is that, as a matter of law, he could not have formed an enterprise with foreign government entities. However, the cases Defendant Beshah cites apply solely to domestic government entities and hold only that civil RICO claims cannot be brought against these government entities as RICO defendants. See Lancaster Community Hospital v. Antelope Valley Hospital Dist., 940 F.2d 397, 404 (9th Cir. 1991). Defendant Beshah thus

confuses the issues of whether a domestic or foreign government entity can be properly sued under civil RICO versus whether a foreign government entity can ever be part of a RICO "enterprise." Two years after its decision in <u>Lancaster</u>, the Ninth Circuit held that government entities can form an enterprise for the purposes of another party's liability under RICO—noting that "seven other circuit courts have found that a government entity may constitute an 'enterprise' within the meaning of RICO" and adopting the view of those circuits. <u>United States v. Freeman</u>, 6 F.3d 586, 597 (9th Cir. 1993) (citing cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth circuits); <u>see also</u> <u>United States v. Dischner</u>, 974 F.2d 1502, 1511 (9th Cir. 1992) ("The statute adequately warned Dischner and Mathisen that their association with each other and the Office of the Mayor and the Department of Public Works constituted a RICO enterprise."). Plaintiffs have alleged that Defendant Beshah negotiated an agreement with Ethiopian officials for the common purpose of depriving Plaintiffs of their property interests. This association extended for at least six years. Plaintiffs have therefore properly alleged that Defendant Beshah was engaged in an enterprise with the Ethiopian government entities.

iv.   <u>"Conduct or Participate . . . in the Conduct"</u>

Plaintiffs have also properly alleged that Defendant Beshah "conducted or participated, directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity." § 1962(c). § 1962(c) provides that

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one need not have "significant control" or "primary responsibility" for the affairs nor "a formal position," but they must have "some part in directing those affairs." <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 179 (1993). One is not liable under that provision unless one has participated in the operation or management of the enterprise itself. <u>Id.</u> at 183.

Defendant Beshah's argument rests on the same reasoning he uses elsewhere, namely that

the Ethiopian Government Defendants cannot be viewed as members of the enterprise and therefore he could not have managed or controlled an enterprise if he was the only member of it. As discussed more fully above, government entities can constitute an enterprise or members of an enterprise for purposes of another party's—Defendant Beshah's—liability. Plaintiffs allege that Beshah participated in and directed the enterprise's activities by entering into agreements by which he agreed to pay, has paid, and continues to pay, through wire transfers originating from the United States, Ethiopian officials to deprive Plaintiffs of their property rights. Therefore, the Court finds that Plaintiffs have alleged facts satisfying the "conduct or participate" requirement under §1962(c).

v.   <u>Affect on Interstate Commerce</u>

The Court finds that Plaintiffs have alleged these activities affected interstate commerce for the purposes of § 1962(c). In <u>United States v. Juv. Male</u>, 118 F.3d 1344 (9th Cir. 1997), the Ninth Circuit explained that "[b]ecause RICO is aimed at activities which, in the aggregate, substantially affect interstate commerce, 'all that is required to establish federal jurisdiction in a RICO prosecution is a showing that the individual predicate racketeering acts have a de minimis impact on interstate commerce.'" <u>Juv. Male</u>, 118 F.3d at 1347. To establish a de minimis effect on interstate commerce, "the Government need not show that a defendant's acts actually affected interstate commerce. Rather, the jurisdictional requirement is satisfied by proof of a probable or potential impact." <u>Id.</u> at 1349. The nexus to interstate commerce can be found from the same acts which constitute the predicate acts or activities of the enterprise. <u>United States v. Bagnariol</u>, 665 F.2d 877, 893 (9th Cir. 1981).

Plaintiffs satisfy this requirement because they allege that Defendant Beshah used the instrumentalities of interstate commerce, including email, other telecommunications, and wire transfers from U.S. banks to facilitate the payment of bribes and/kickbacks to the Ethiopian government officials. <u>See, e.g.</u>, <u>id.</u> (collecting cases where impact on interstate commerce was found through interstate telephone calls); <u>Republic of the Philippines v. Marcos</u>, 862 F.2d 1355, 1359 (9th Cir. 1988). Plaintiffs further allege a number of other effects on the domestic foreign commerce of this country, including that under Beshah's ownership, Biselex sells its products to

- 17 -

the USAID and the Ethiopian government has purchased and sold Biselex products and used the proceeds to finance various domestic marketing and tourism endeavors. Considering these effects in the aggregate, Plaintiffs have properly pled a de minimus affect on interstate commerce at this stage of the pleading.

### b. RICO Conspiracy

Next, Defendant Beshah argues that Plaintiffs fail to allege crucial elements of a RICO Conspiracy claim under 18 U.S.C. § 1962(d), including a meeting of the minds or Defendant Beshah's knowledge and agreement to facilitate the scheme. Beshah further argues that the conspiracy claim necessarily fails because Plaintiffs do not properly allege violation of substantive RICO violation.

Section 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of the [other RICO] provisions." 18 U.S.C. § 1962(d). To establish a conspiracy in violation of § 1962(d), Plaintiffs must plead "either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participate in, a violation of two predicate offenses." Howard v. Am. Online Inc., 208 F.3d 741, 751 (9th Cir. 2000). "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." Id. (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)). A defendant must also have been "aware of the essential nature and scope of the enterprise and intended to participate in it." Baumer v. Pachl, 8 F.3d 1341, 1346 (9th Cir. 1993). However, "it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy." Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n, 298 F.3d 768, 774-75 (9th Cir. 2002). Rather, "[i]t is the mere agreement to violate RICO that § 1962(d) forbids" Id. Further, the "illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." Id. at 775 "If a RICO conspiracy is demonstrated, '[a]ll conspirators are liable for the acts of their co-conspirators.'" Id

The Court finds that Plaintiffs have sufficiently pled a RICO conspiracy in violation of §

1962(d). Plaintiffs allege that Defendant Beshah negotiated and entered into an agreement with Ethiopian Government entities wherein Beshah was to pay bribes and/or kickbacks to Ethiopian officials acting on behalf of the government organizations. These bribes were paid as consideration for continued possession of Biselex and the house. As discussed more fully above, this agreement and series of payments that occurred over the course of at least six years would constitute a violation of the substantive criminal offenses prohibited by the Travel Act and FCPA, if completed. By entering into the agreement and facilitating payments to the Ethiopian officials, Beshah not only knew of and agreed to this endeavor, Baumer, 8 F.3d at 1346, but also "further[ed] or facilitate[ed]" it. Howard, 208 F.3d at 751.

### c.  Statute of Limitations for Breach of Contract Claim

In addition, Beshah argues that Count IV of Plaintiffs' complaint concerning Defendant Beshah's breach of the indemnity contract is barred under NRS 11.190, which provides a six-year statute of limitations for commencement of civil actions upon a contract founded upon an instrument in writing. Beshah contends that the latest date the contract was breached would have been in 2012 and Plaintiffs waited until 2021 to bring the instant suit. Plaintiffs argue that Nevada's statute of limitations do not apply to Count IV because the "unambiguous language of the Indemnity Contract's choice of law provision provides the '[a]greement shall be governed by the Civil Code of 1960 and other relevant laws of Ethiopia.'" They contend that under the Ethiopian Civil Code of 1960, a contract claim may be brought within ten years and therefore Plaintiffs had until at least 2022 to bring their contract claim. They further argue that even if Nevada statute of limitations did apply, the limitations period should have been equitably told during the pendency of their proceedings in Ethiopia. They also argue that the statute of limitations may have been suspended during the periods when Beshah was outside of the United States.

The Court finds that the breach of contract claim is not barred under the Nevada statute of limitations because the contract's choice of law provision. Federal courts must apply the choice of law rules of the forum state. See Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Fields v. Legacy Health Sys., 413 F.3d 943, 950 (9th Cir. 2005). Generally, Nevada follows the

Restatement (Second) of Conflict of Laws (1971) in determining choice-of-law questions involving contracts. <u>See</u> <u>Progressive Gulf Ins. Co. v. Faehnrich</u>, 130 Nev. 167, 171 (2014).

Nevada law honors the expressed intention of the parties as to the applicable law in the construction of a contract if the parties "acted in good faith and not to evade the law of the real situs of the contract." <u>See</u> <u>Ferdie Sievers & Lake Tahoe Land Co. v. Diversified Mortgage Investors</u>, 95 Nev. 811, 815 (1979) (citing cases). "The situs fixed by the agreement, however, must have a substantial relation with the transaction, and the agreement must not be contrary to the public policy of the forum." <u>Id.</u> To determine whether a state possesses a substantial relationship with a contract, courts consider five factors: "(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." <u>Consolidated Generator-Nev. Inc. v. Cummins Engine Co., Inc.</u>, 114 Nev. 1304, 1308 (1998) (citations omitted).

As Plaintiffs argue, and the Court agrees, there are no allegations that the contract was not entered in good faith. The contract was to be performed in Ethiopia in that Beshah was to manage Biselex's affairs while Plaintiffs were away and return the company and home to Plaintiffs upon their return to the country. Moreover, the location of the subject matter of the contract—Biselex and the home in Addis Ababa—is in Ethiopia, which is also where Biselex was incorporated. <u>See</u> <u>Hatfield v. Halifax PLC</u>, 564 F.3d 1177, 1183 (9th Cir. 2009) (The fact that Halifax is a United Kingdom company is sufficient to establish a substantial relationship between England and the parties, such that there is a reasonable basis for applying the English choice of law provision). Moreover, Plaintiffs' seven plus years of litigation in Ethiopia show that Plaintiffs were actively seeking—not avoiding—the law of the situs.

### d.  Forum Non Conveniens

Defendant Beshah argues that the claims should be dismissed in their entirety under the doctrine of *forum non conveniens* because the claims concern Ethiopian litigation and Ethiopian government officials. Beshah further argues that it would be burdensome for him to re-litigate the

same issues in the United States, that most, if not all, of the evidence is located in Ethiopia, and Ethiopia has a greater interest in the litigation. Plaintiffs argue that Plaintiff Ghebreyesus is a U.S. citizen and Defendant Beshah is an Ethiopian-American residing in Nevada; the Ethiopian court system has proven itself to be inadequate; the burden of obtaining evidence will not be as high as Defendant Beshah claims; that Defendant Beshah will not be burdened by litigating the case in Nevada since he resides here and requested the D.C. District Court to transfer the case to Nevada; and the United States has an interest in the litigation because the funds maintained in U.S. bank accounts were central to the bribery scheme.

"The principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947). Historically, the doctrine's purpose is to root out cases in which the "open door" of broad jurisdiction and venue laws "may admit those who seek not simply justice but perhaps justice blended with some harassment," and particularly cases in which a plaintiff resorts "to a strategy of forcing the trial at a most inconvenient place for an adversary." Id. See also Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249 n.15 (1981)

The doctrine "is based on the inherent power of the courts to decline jurisdiction in exceptional circumstances." Paper Operations Consultants Int'l, Ltd. v. S.S. Hong Kong Amber, 513 F.2d 667, 670 (9th Cir. 1975); Carijano v. Occidental Petroleum Corp., 643 F.3d 1216, 1224 (9th Cir. 2011). "Dismissal is appropriate only if the defendant establishes '(1) the existence of an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal.'" Ayco Farms, Inc. v. Ochoa, 862 F.3d 945, 948 (9th Cir. 2017) (quoting Bos. Telecomms. Grp., Inc. v. Wood, 588 F.3d 1201, 1206 (9th Cir. 2009)). The Ninth Circuit has explained, "Although we have not previously addressed the question squarely, we have typically applied the doctrine of *forum non conveniens* by comparing the burdens and benefits of litigation in a foreign country against the burdens and benefits of litigation in a particular state." Id. at 949.

"Although a plaintiff is generally entitled to deference in its choice of forum, especially if the plaintiff is a U.S. citizen or resident, that deference is 'far from absolute.'" Id. at 949-50 (quoting Ranza v. Nike, Inc., 793 F.3d 1059, 1076 (9th Cir. 2015)). "Of course, 'less deference

is not the same thing as no deference.' For a U.S. citizen's choice of forum to be rejected, the private and public interest factors must 'strongly favor trial in a foreign country.'" <u>Id.</u> at 950 (citations omitted).

"The private interest factors are: (1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) 'all other practical problems that make trial of a case easy, expeditious and inexpensive.' The public interest factors are '(1) [the] local interest of [the] lawsuit; (2) the court's familiarity with governing law; (3) [the] burden on local courts and juries; (4) [the amount of] congestion in the court; and (5) the costs of resolving a dispute unrelated to [the] forum.'" <u>Id.</u>

The Court finds that the private and public interest factors weigh in favor of Ghebreyesus and Yohannes. Ghebreyesus is a U.S. citizen, thus the Court affords Ghebreyesus deference in his choice of forum. The private interest factors do not strongly favor trial in a foreign country. Defendant Beshah resides in Nevada and he succeeded in transferring the venue of this case from the District of Columbia District Court to the District of Nevada in order to make the litigation more convenient for him. The Ethiopian entities have thus far proven to be amenable to service, there is nothing to suggest that other witnesses would not comply with a valid exercise of U.S. subpoena power. The costs of bringing witnesses to trial for Beshah would be significant if his witnesses are from Ethiopia, but Beshah has not identified who these witnesses are. Further, some of Beshah's witnesses may also be located in the U.S. given the allegations that he negotiated the agreement from Nevada and used his U.S. bank accounts to facilitate the wire payments. Moreover, the judgment against Beshah, a resident of Nevada, would be fully enforceable in the U.S.

The public interest factors also do not strongly favor trial in a foreign country. As the claims concern one U.S. citizen and one Ethiopian-American who resides in Nevada, there is significant domestic and local interest in the lawsuit. Further, the U.S. has a strong interest in preventing violations of the Travel Act and FCPA. The burden and congestion of litigating the case in the

forum is not substantial. The Court has substantial familiarity with the federal RICO allegations and federal law regarding the predicate acts.

### e. *Res Judicata* and Comity

Defendant Beshah next argues that all the claims against him should be dismissed under the doctrine of *res judicata* because the Ethiopian Federal Supreme Court and Cassation Division have entered a final judgment on Plaintiffs' claims. Specifically, Beshah argues that Plaintiff Yohannes was the same party in both actions, the final judgment of the Ethiopian courts was valid, and the instant civil action is based on the same claims Plaintiffs brought or could have brought before the Ethiopian courts. Plaintiffs argue that foreign judgments, unlike domestic ones, are not subject to automatic preclusive effect under the doctrine of *res judicata*, but instead are given preclusive effect under principles of comity.

Alternatively, Defendant Beshah also asks this Court to dismiss the case based on principles of international comity. In opposition, Plaintiffs' argue that principles of comity do not support dismissal because the foreign forum is not adequate as demonstrated by the denial of justice that Plaintiffs experienced litigating these issues in Ethiopia. They argue the complaint contains numerous allegations of conduct connected to the United States, Mr. Ghebreyesus is a U.S. citizen, and Beshah resides in the U.S. They further argue that the United States also has strong foreign policy and public policy interests in ensuring that corrupt practices originating in the United States that violate the Travel Act and FCPA are actionable in the United States, especially where those violations cause domestic injuries. Plaintiffs also argue Ethiopia's interest in the suit is a neutral factor given the inadequacies of the foreign forum and the overwhelming U.S. interests at play.

United States federal courts may choose to give *res judicata* effect to prior foreign country judgments as a matter of comity but are not required to do so. See Hilton v. Guyot, 159 U.S. 113, 205-206 (1895); Wilson v. Marchington, 127 F.3d 805, 808 (9th Cir. 1997) ("The extent to which the United States, or any state, honors the judicial decrees of foreign nations is a matter of choice, governed by 'the comity of nations.'"); Moore's Federal Practice, Civil - § 130.50 ("Comity, the primary consideration in determining whether a foreign judgment will be recognized, is a general

directive, rather than a specified compulsory standard . . . Neither the Full Faith and Credit Clause of the United States Constitution nor 28 U.S.C. § 1738 require the recognition of foreign judgments.").

International comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." Mujica v. AirScan Inc., 771 F.3d 580, 597 (9th Cir. 2014) (quoting Hilton, 159 U.S. at 164). It is "a doctrine of prudential abstention, one that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law." Id. at 598 (internal citation and quotations marks omitted).

District courts deciding whether to dismiss a case on comity grounds are to weigh (1) "the strength of the United States' interest in using a foreign forum," (2) "the strength of the foreign governments' interests," and (3) "the adequacy of the alternative forum." Id. at 603. As to the assessing each country's interests, the court should consider this nonexclusive list of factors "(1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) the foreign policy interests of the [countries], and (5) any public policy interests." Cooper v. Tokyo Elec. Power Co., Inc., 860 F.3d 1193, 1205 (9th Cir. 2017) (citing Mujica, 771 F.3d at 604).

The Court finds that the factors set out in Mujica and Cooper do not weigh in favor of dismissing the case against Defendant Beshah at this stage. First, the conduct in question occurred in both the U.S. and Ethiopia. As discussed above, out of the three parties to Defendant Beshah's Motion to Dismiss, Ghebreyesus is a U.S. citizen, both Beshah and Ghebreyesus reside in the U.S., and only Beshah is of Ethiopian nationality. Although Ethiopia's interest in eradicating bribery is certainly strong, the character of the conduct, especially the RICO claims, is one that the U.S. has a significant interest in preventing. Indeed, the Foreign Corrupt Practices Act was enacted to address the very issue that is allegedly presented in this case—a U.S. citizen bribing foreign government officials—because of its harm to U.S. diplomatic relations. Clayco Petroleum Corp.

v. Occidental Petroleum Corp., 712 F.2d 404, 408 (9th Cir. 1983). As the House of Representatives Report accompanying the 1977 legislation explained:

> Corporate bribery also creates severe foreign policy problems for the United States. The revelation of improper payments invariably tends to embarrass friendly governments, lower the esteem for the United States among the citizens of foreign nations, and lend credence to the suspicions sown by foreign opponents of the United States that American enterprises exert a corrupting influence on the political processes of their nations.

> H.R. Rep. No. 640, 95th Cong., 1st Sess. 5 (1977)

Further, comity is "not a jurisdictional question," is highly fact-based determination, and thus is generally "not measured as of the outset of the litigation." Cooper, 860 F.3d at 1210. The Court will continue to consider the issue of comity throughout the litigation of this case. As the Ninth Circuit in Cooper explained:

> [Comity] is a more fluid doctrine, one that may change in the course of the litigation. Should either the facts or the interests of the governments change—particularly the interests of the United States—the district court would be free to revisit this question.

> Id.

### f.  Plaintiffs' Authority to Sue in their Capacities as Beneficiaries

Finally, Defendant Beshah argues the case should be dismissed against Plaintiffs in their capacities as beneficiaries, legatees, or devisees of the Estate of Mr. Ghebrelul or as Personal Representatives of the Estate of Mr. Ghebrelul. The Court rejects this argument. First, Plaintiff Yohannes has not brought a claim on behalf of her husband's estate. Second, a pleading need not allege facts to sue or be sued in a representative capacity except when it is required to show that the court has jurisdiction. Fed. Rule. Civ. P. 9(a)(1)(A). The Court's jurisdiction in this case does not turn on whether Plaintiff Ghebreyesus has in fact been appointed as trustee of his father's estate because Ghebreyesus has alleged facts demonstrating his own injury and thus standing to bring the claim. See supra, pp. 9-13. Further, to raise an issue of capacity, the party must do so "by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge." FRCP 9(a)(2). Beshah fails to raise supporting facts that are peculiarly within his

knowledge as required by this rule. For these reasons, the Court declines to dismiss Plaintiff Ghebreyesus in his capacity as Trustee of the Estate of Ghebrelul.

Accordingly, the Court denies Defendant Beshah's Motion to Dismiss in its entirety.

## VI.     Motion to Dismiss by Ethiopian Government Defendants

Having considered Defendant Beshah's Motion to Dismiss, the Court now turns to the Ethiopian Government Defendants' Motion to Dismiss.

Ethiopian Government Defendants move for this Court to dismiss Plaintiffs' complaint pursuant to the Foreign Sovereign Immunities Act, Rule 12(b)(6), *forum non conveniens*, and the act of state doctrine. Because the Court does not find that Plaintiffs allege sufficient facts to confer jurisdiction over the foreign government defendants under the Foreign Sovereign Immunity Act, the Court grants the motion. However, the Court declines the request to impose sanctions.

### a.   Foreign Sovereign Immunity Act (FSIA)

The Foreign Sovereign Immunities Act (FSIA) "supplies the ground rules for 'obtaining jurisdiction over a foreign state in the courts of this country.'" Fed. Republic of Germany v. Philipp, 141 S. Ct. 703, 709 (2021) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989)). "The Act creates a baseline presumption of immunity from suit." Id. at 709 (citing § 1604). "[U]nless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Id. (quoting Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993)). Plaintiffs invoke the "expropriation" exception under § 1605(a)(3) and the "commercial activity" exception under § 1605(a)(2). Defendants argue that none apply. "Where a defendant claims only that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction, the Court treats the challenge as any other motion to dismiss on the pleadings for lack of jurisdiction." Terenkian v. Republic of Iraq, 694 F.3d 1122, 1131 (9th Cir. 2012) (internal citations and quotation marks omitted). The Court therefore determines "whether the complaint alleges sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id.

### i. Commercial Activity Exception

The commercial activity exception under § 1605(a)(2) provides that a foreign state is not immune from jurisdiction where:

> the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States....

28 U.S.C. § 1605(a)(2)

"Courts have construed this commercial activity provision to have three independent clauses, and have used different criteria for each of the three separate clauses to assess a claimed exception." Terenkian, 694 F.3d at 1127. At issue in this case are the first and third clauses. Plaintiffs allege that Count I, takings in violation of international law, satisfies the third clause and Counts II and III, RICO and RICO Conspiracy, satisfy the first clause.

Defendants argue that Plaintiffs do not satisfy either clause under the "commercial activity" exception because the claims concern sovereign and not commercial conduct. Defendants also argue that the acts were not taken in connection with any commercial activity because Ethiopia's marketing and tourism ventures in the United States bear no relationship to the acts giving rise to the claims. Defendants further argue that there is no direct effect in the United States because the injuries were suffered on foreign soil by Plaintiffs who subsequently returned to the U.S. Defendants also argue that the allegations regarding commercial activity in the U.S., namely that the Ethiopian government co-mingled proceeds from the sale of Biselex products with government funds that were later spent in the U.S., is too attenuated from the act itself to be a "direct effect."

As to the third clause, Plaintiffs respond that "acts" of expropriation under the third clause of the "commercial activity" section may be either "commercial" or "sovereign" because the third clause of § 1605(a)(2) requires only that the cause of action be "based upon" an "act." Plaintiffs also argue that the "commercial activity" requirement is satisfied by the bribery and/or kickback agreements themselves that officials of the Ethiopian Defendants entered into with Defendant

Beshah. Plaintiffs contend that this commercial activity had a direct effect in the United States because the takings were done in exchange for Beshah's payments to Ethiopian officials from his location in the United States using U.S. bank accounts. They allege that the payments are legally significant because Beshah made them as consideration for the agreements entered into with Ethiopian officials to take Plaintiffs' property.

With respect to the first clause, Plaintiffs argue that the Court has subject matter jurisdiction over Plaintiffs' RICO claims because the RICO claims against the foreign state are based upon the agreements between Beshah and the Ethiopian government entities and these agreements are "commercial activities" within the meaning of the FSIA. Plaintiffs also argue that these agreements were "carried on in the United States" by the Ethiopian Defendants as they were negotiated through email and other forms of telecommunications between officials of the Ethiopian Defendants and Beshah from his location in the United States, and the agreements required substantial aspects of performance to occur in the United States.

### 1.  Clause Three

The Court does not find that Plaintiffs have pled facts to show that the third clause of § 1605(a)(2) applies.

Under Clause Three, the action must be (1) based upon an act outside the territory of the United States (2) taken in connection with a commercial activity of the foreign state elsewhere (3) that causes a direct effect in the United States. See Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 710 (9th Cir. 1992). Plaintiffs are correct that the "act" the action is based upon need not be commercial in nature and the seizure of Plaintiffs' property satisfies the "act" requirement. Id. (holding that Argentina's seizure of a hotel outside U.S. territory satisfied the "act" element). But the act needs to be taken in connection with commercial activity that has a direct effect in the United States. To satisfy the "in connection with" requirement, the acts complained of must have some "substantive connection" or a "causal link" to the commercial activities. Adler v. Fed. Republic of Nigeria, 107 F.3d 720, 726 (9th Cir. 1997)

A "commercial activity" is "either a regular course of commercial conduct or a particular

commercial transaction or act." Terenkian, 694 F.3d at 1132 (citing 28 U.S.C. § 1603(d)). Commercial activity need not be motivated by profit to be commercial for purposes of the FSIA. Joseph v. Office of the Consulate Gen. of Nigeria, 830 F.2d 1018, 1024 (9th Cir.1987). The commercial character of an activity depends on its nature rather than its purpose. Cassirer v. Kingdom of Spain, 616 F.3d 1019, 1032 (9th Cir. 2010). The important thing is that the actions are "the type of actions by which a private party engages in trade and traffic or commerce." Id. (quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992)).

"[A]n effect is 'direct' if it follows as an immediate consequence of the defendant's activity." Weltover, 504 U.S. at 618 (internal quotation marks omitted). A direct effect requires that "legally significant acts giving rise to the claim occurred" in the United States. Adler, 107 F.3d at 727. The effect "must be more than 'purely trivial' or 'remote and attenuated.'" Terenkian, 694 F.3d at 1134 (quoting Weltover, 504 U.S. at 618). "Mere financial loss suffered by a person, whether individual or corporate, in the United States is not, in itself, sufficient to constitute a direct effect." Siderman de Blake, 965 F.2d at 710. Breach of contract claims generally give rise to a direct effect only where the Plaintiffs are U.S. citizens and where the contracts provided for payments or performance to be made in the United States. Siderman de Blake, 965 F.2d at 710-11 (citing Meadows v. Dominican Republic, 817 F.2d 517 (9th Cir. 1987); Gregorian v. Izvestia, 871 F.2d 1515, 1527 (9th Cir. 1989)).

The Court finds that Plaintiffs have not met their burden in alleging that any commercial activity in connection with the alleged takings had a direct effect in the United States for the purposes of FSIA. The Court finds that the bribes and/or kickbacks paid from Beshah to the Ethiopian officials do not, on their own, satisfy the definition of "commercial activity." The facts here are unlike those in Adler, where the plaintiff had paid consideration for the assignment of a government contract for the computerization of Nigerian oil fields; had alleged that he had paid over $ 5 million to Nigerian officials; and traveled as well as hired others to travel to Nigeria in an effort to have the contract honored. Adler v. Fed. Republic of Nigeria, 107 F.3d 720, 726 (9th Cir. 1997). Here, Plaintiffs provide no details when a contract was formed, what the terms of the contract were, how much money was transferred, or when it was transferred. Without more, the

Court cannot determine whether the "nature" of the agreements was in fact commercial.

Further, even if the bribery scheme was a commercial activity, Plaintiffs do not show that this scheme had a direct effect in the United States.[2] In <u>Adler</u> and <u>Weltover</u>, the courts found a direct effect from commercial activity because the contract had specified that payments based on the agreements were to be made in the United States and the contract had been breached. <u>Adler</u>, 107 F.3d at 726; <u>Weltover</u>, 504 U.S. at 617-620. Here, Plaintiffs allege the existence of an agreement to pay and receive bribes, but do not point to any breach, nor any provisions of the agreement which required the Ethiopian government to pay or perform the contract in the United States. Rather Beshah was making payments from the United States to Ethiopia for actions taken in Ethiopia. <u>See Terenkian</u>, 694 F.3d 1135-37 (declining to find a "direct effect" because Iraq had no obligation to perform in the United States and the act that formed the basis of the suit occurred in Iraq). That Ghebreyesus, a U.S. citizen residing in Minnesota, suffered financial loss, is not enough to satisfy the direct effect test. <u>See Siderman de Blake</u>, 965 F.2d at 710. The allegations that Beshah negotiated the contract in part from his location in the United States and was to make payments from his bank accounts in the United States is likewise insufficient. <u>Terenkian</u>, 694 F.3d at 1136 (declining to find jurisdiction under clause three despite assuming that the contract was executed in New York).

## 2.   Clause One

Setting aside whether foreign government entities can be properly sued as defendants under RICO, the Court finds that it does not have jurisdiction over the Ethiopian Government Defendants on Counts II and III because Plaintiffs do not plead facts sufficient to invoke the first clause of the commercial activity exception.

Unlike the third clause which can be based upon an "act," the first clause requires the claim against a foreign state to be "based upon a commercial activity carried on in the United States by

---

[2] The Court notes that unlike the low threshold for the interstate commerce nexus under a RICO claim, much more than a de minimus effect is required to meet the commercial activity exception to the usual rule that foreign sovereigns are immune from suit. <u>See</u> <u>supra</u>, pp. 17-18.

the foreign state." <u>Siderman de Blake</u>, 965 F.2d at 708. "In order for a foreign state to lose its sovereign immunity under the first clause (1) the foreign state's commercial activity in the United States must be the basis of (i.e., a necessary element of) the plaintiff's claim; and (2) that commercial activity must be significant and have substantial contact with the United States." <u>Terenkian</u>, 694 F.3d at 1133.

Here, Plaintiffs' grievance under Counts II and III is based on the bribery scheme between Defendant Beshah and the Ethiopian Government Defendants in violation of RICO and RICO conspiracy. As discussed above, Plaintiffs do not allege sufficient facts to show that the payment of bribes and/or kickbacks from Beshah to Ethiopian officials was, on its own, "a commercial activity." Even if this agreement could constitute a commercial activity, it is not significant enough to meet this clause of the commercial activity exception. <u>Terenkian</u>, 694 F.3d at 1133 (noting that a "foreign nation's contract negotiations, including a meeting, and telephone and wire communications," are "insufficiently significant to meet this exception") (citing <u>Gen. Elec. Cap. Corp. v. Grossman</u>, 991 F.2d 1376, 1383-84 (8th Cir. 1993)).

### i. Expropriation Exception

Defendants make a number of arguments against Plaintiffs' invocation of the FSIA's expropriation exception, including that the conduct here was attributable to natural persons and not sovereigns and that there was no taking of property because Plaintiffs did not control Biselex at the time of the court proceedings or retain ownership interest in the home at the time it was occupied. They also contend that even if a taking occurred, the domestic takings rule bars Plaintiffs' action where a foreign government takes property belonging to its own nationals. Plaintiffs argue that the Ethiopian Government Defendants took and retook Plaintiffs' property rights in violation of international law by seizing Biselex Assets, taking possession of the home through armed forces, declaring the prior CEPR determination invalid, and denying justice to Plaintiffs through the issuance of arbitrary and irrational decisions motivated by anti-Eritrean animus. Moreover, Plaintiffs' claim that the domestic takings rule does not apply because Plaintiffs were not Ethiopian nationals at the time of the takings.

Section 1605(a)(3) provides that a foreign state is not immune in any case

> in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

Cassirer, 616 F.3d at 1027.

Under this exception, (1) the claim must be one in which rights in property are in issue, (2) the property in question must have been taken in violation of international law, and (3) one of two commercial-activity nexuses with the United States must be satisfied. "A taking offends international law when it does not serve a public purpose, when it discriminates against those who are not nationals of the country, or when it is not accomplished with payment of just compensation" Id. at 1027. Because each of the Ethiopian Defendants is a foreign state or political subdivision, Plaintiffs must satisfy the first clause of the nexus requirement, which requires that "the property taken or property exchanged for that property be present in the United States in connection with a commercial activity of the foreign state." § 1605(3).

In Helmerich & Payne, the Supreme Court established a heightened jurisdictional standard for pleading that a foreign sovereign's actions fall under the expropriation exception. Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co., 581 U.S. 170, 187 (2017) (overruling the Ninth Circuit's prior standard, which permitted the abrogation of sovereign immunity where a plaintiff pleads an expropriation claim that is not "wholly insubstantial or frivolous"). Thus, "facts bring the case within the scope of the expropriation exception only if they do show (and not just arguably show) a taking of property in violation of international law. Simply making a nonfrivolous argument to that effect is not sufficient." Id. "Consistent with foreign sovereign immunity's basic objective, namely, to free a foreign sovereign from suit, the court should normally resolve those factual disputes and reach a decision about immunity as near to the outset of the case as is reasonably possible." Id. at 174. "For guidance regarding the norms against takings in violation of international law, [courts] may look to court decisions, United States law, the work of jurists, and the usage of nations." Altmann v. Republic of Austria, 317 F.3d 954, 968

1   (9th Cir. 2002).

2          The Court finds that the acts here are attributable to a sovereign and that the domestic

3   takings rule does not apply at this stage of the pleadings because Plaintiffs allege Yohannes and

4   Ghebrelul were both Eritrean (not Ethiopian) nationals. However, the Court nonetheless does not

5   find that Plaintiffs properly alleged a taking occurred in violation of international law. Therefore,

6   FSIA's expropriation exception does not apply. Plaintiffs make conclusory allegations that each

7   Ethiopian court to hear their case made a "decision [that] was arbitrary, discriminatory and

8   irrational, and represented a denial of justice in violation of international law." But many, if not

9   all the facts Plaintiffs allege in support of this conclusion are founded in Plaintiffs' disagreement

10  with different aspects of legal proceedings decided against them. Rather than pointing to facts that

11  demonstrate clear judicial injustice or discrimination, Plaintiffs ask the Court to determine that

12  various procedural and legal determinations made by the Ethiopian courts were arbitrary or

13  irrational. See Salem Case (Egypt v. United States), 2 R.I.A.A. 1161, 1202 (1932) (describing the

14  standard for denial of justice under international law as including only "exorbitant cases

15  of judicial injustice," including "inexcusable delay of proceedings; obvious discrimination of

16  foreigners against natives; [and] palpable and malicious iniquity of a judgment.").

17         By way of example Plaintiffs allege the FHC "refused to permit a key witness to testify,"

18  the FHC "ignored the terms of the indemnity contract," the FHC's decision was in direct

19  contravention of the CEPR's determination, and both the Federal Supreme Court and Cassation

20  Division's decisions on appeal were "arbitrarily and irrationally decided because neither court

21  addressed any of the clear legal and factual errors committed by the courts below." The Plaintiffs

22  go on to argue that "the only explanation" for these actions was [Defendant Beshah] took

23  advantage of anti-Eritrean animus and agreed to pay [Ethiopian government officials] . . . to act in

24  their official capacities to deprive Ghebrelul and Plaintiffs of their property rights." Although the

25  court's actions are arguably consistent with Defendants' alleged bribery scheme, discriminatory

26  motives, and an intentional denial of justice, it "does not exclude . . . plausible and innocuous

27  alternative explanation[s]." Eclectic Props. E., 751 F.3d at 998. For example, FHC's decision to

28  disregard the CEPR determination is consistent with another Ethiopian court, the FFIC's, prior

determination that the CEPR ruling was *ultra vires*. And MOFA's issuance of the document that transferred the house to Beshah was in accordance with both the FFIC and FHC's decision. It is also just as likely that the Federal Supreme Court and Cassation Division's decision to affirm the lower court's ruling was based on that court's reading of the facts and law. [3] Moreover, Plaintiffs' allegations that the FHC litigation alone took five years and that there was an additional two years spent appealing the decisions to the Federal Supreme Court and Cassation Division belies Plaintiffs' allegations that "there was a complete lack of process." Notably, Plaintiffs do not point to a single statement made by any of the courts to review this matter, which evidences anti-Eritrean animus towards them throughout the seven years that this case was litigated in Ethiopia.

Accordingly Counts I, II, and III are dismissed as against the Ethiopian Government Defendants only.[4]

### b.  Request for Sanctions

Defendants also request this Court to impose sanctions under Rule 11(c). They argue that Plaintiffs knew or should have known that the factual contentions of their pleading do not "have evidentiary support or will not likely have evidentiary support after a reasonable opportunity for investigation and discovery." As Plaintiffs point out, this motion was improperly brought. Rule 11(c)(2) requires motions for sanctions to "be made separately from any other motions" and must "not be filed or presented to the court" unless first served upon the opposing party 21 days before the filing. Defendants did not comply with either requirement. Moreover, the Court does not find based on the face of the complaint that Plaintiffs' factual contentions do not or would not have any evidentiary support. The Court therefore denies Defendants' request for sanctions.

---

[3] Although the Court does not reach the act of state of doctrine because "[i]f a court lacks jurisdiction over a case involving a foreign state, the act of state doctrine never comes into play" Siderman de Blake, 965 F.2d at 707, the Court notes that this type of second guessing of foreign judicial decision making is what the act of state doctrine seeks to prevent. See Von Saher v. Norton Simon Museum of Art at Pasadena, 897 F.3d 1141, 1156 (9th Cir. 2018).

[4] Because the Court finds that its lack of jurisdiction under FSIA is decisive, it does not reach the question of whether foreign governments can be sued under civil RICO or the Ethiopian Government Defendants' act of state and *forum non conveniens* claims. See In re Republic of Philippines, 309 F. 3d 1143, 1149 (9th Cir. 2002) (holding that district court must "address the merits of the immunity question first in order to preserve the immunity that may be determined to exist.").

## II.   CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Beshah's Motion to Dismiss (ECF No. 62) is **DENIED**. Discovery, including depositions, may proceed against Defendant Beshah consistent with the December 12, 2022 Joint Discovery Plan and Scheduling Order (ECF No. 58).

**IT IS FURTHER ORDERED** that Defendants Federal Democratic Republic of Ethiopia, Ministry of Foreign Affairs of Ethiopia, City of Addis Ababa, Sub-City of Bole, Addis Ababa, and Federal First Instance Court of Ethiopia (ECF No. 63) is **GRANTED** in part and **DENIED** in part. All of Plaintiffs' claims against the Ethiopian Government Defendants, Counts I-III are dismissed without prejudice. But the Court denies the request for sanctions.

**IT IS FURTHER ORDERED** that the parties' Joint Motion for Leave to Exceed Page Limits (ECF No. 57) is **GRANTED** nunc pro tunc.

**DATED:** September 30, 2023

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**